IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**BETTY JO KIDD,**

    **Plaintiff,**

v.

    Civil Action No. 5:04CV50
    (Judge Stamp)

**JO ANNE B. BARNHART,
COMMISSIONER OF
SOCIAL SECURITY,**

    **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g), to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on Plaintiff's Motion for Remand and Defendant's Motion for Summary Judgment and has been referred to the undersigned United States Magistrate Judge for submission of a Report and Recommendation. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).

### I. Procedural History

Betty Jo Kidd ("Plaintiff") filed an application for DIB on August 9, 2002, alleging disability as of December 31, 1999, due to breast cancer,[1] chest pain, back and hip pain, fibromyalgia, and

---

[1] While Plaintiff had been diagnosed with breast cancer and had undergone surgery by the time of her application, she does not allege she had breast cancer at the time her insured status expired (R. 80, 129).

migraine headaches (R. 66-69, 80). The application was denied at the initial and reconsideration levels (R. 47, 55). Plaintiff requested further review, and Administrative Law Judge Jay Levine ("ALJ") held an administrative hearing on April 30, 2003 (R. 277). Plaintiff, who was represented by counsel, appeared and testified, as did Vocational Expert Lawrence Ostrowski ("VE").

On May 27, 2003, the ALJ entered a decision finding Plaintiff had not been under a disability, as defined in the Social Security Act, at any time through December 31, 1999, her date last insured (R. 23).

Plaintiff filed a Request for Review of the ALJ's decision on July 7, 2003 (R. 12). Plaintiff contends she submitted additional evidence to the Appeals Council on or about July, 2003. Said evidence, however, was apparently not considered by the Appeals Council nor made a part of the administrative transcript (Plaintiff's brief at 12). The Appeals Council denied Plaintiff's Request for Review on January 15, 2004, making the ALJ's decision the final decision of the Commissioner in this matter (R. 12).

## II. Statement of Facts

Plaintiff was born June 3, 1946, and was 52 years old at the time her disability insurance expired (R. 405). She is a high school graduate and worked as a waitress at a fast food Chinese restaurant from 1987 to 1988, and as a commercial sewing machine operator from 1989 through 1995 (R. 81, 282, 283). She last worked in August 1995 (R. 80).

On March 11, 1994, Plaintiff was admitted to the hospital with chest pain which started two days earlier (R. 228-229). She underwent a left heart catheterization, angiography, and left ventriculography on March 15, 1994 (R. 222). All tests were normal and arteries unobstructed. There was minimal mitral regurgitation. She was discharged the next day (R. 234).

On March 27, 1995, Plaintiff presented to Dr. Hersey, her treating physician, with complaints of migraine headache with dizziness (R. 188). She was also tired and had shortness of breath. Dr. Hersey referred her to Dr. John Tellers.

On April 10, 1995, Plaintiff presented to John Tellers, M.D. for recurrent headaches (R. 213). The doctor noted, however, she had gone almost six months without a severe migraine-type headache. She did report that during that time she had a lot of other, non-migraine-type headaches that usually responded to Advil. Her examination was unremarkable, with the exception of a low vitamin B-12 level (R. 205).

On June 2, 1995, Plaintiff presented to Dr. Hersey for complaints of pressure in the back of her head, which she said felt like a hand was pushing her head down to the steering wheel while she was driving. She took Advil. Dr. Hersey noted Plaintiff had a history of migraine headaches, but that the description was "rather bizarre." She also reported an extensive list of fears including cerebral aneurysm, despite a negative CT scan.

On June 19, 1995, Dr. Hersey reviewed Dr. Tellers' report and began vitamin B-12 shots (R. 187). Plaintiff's lipids were elevated and she was continued on Zocor. Dr. Hersey noted she had a "slow" affect but did not appear depressed.

On July 25, 1995, Plaintiff reported having severe headaches only about once every three months (R. 204). She did, however, report other headaches that she thought might occur daily. The headaches responded to Imitrex in about 20 minutes. Dr. Tellers opined Plaintiff's severe headaches were not frequent enough to justify prophylactic medication such as Inderal.

On August 18, 1995, Plaintiff told Dr. Hersey her right arm was aching up around her shoulder and neck for the past two weeks (R. 187). The arm would go numb and she dropped things.

3

She was referred for an EMG of the arm.

An EMG report dated August 25, 1995, indicated mild carpal tunnel syndrome on the right and minimal carpal tunnel syndrome on the left (R. 201). She also had some tenderness in the extensor forearm musculature in the area of "tennis elbow," with no weakness or atrophy of muscles in that distribution.

On September 26, 1995, Dr. Hersey noted the EMG showed Plaintiff had mild carpal tunnel syndrome bilaterally as well as tennis elbow which was reportedly very painful over the lateral epicondyle of the right elbow (R. 186). He ordered her a tennis elbow splint and prescribed Voltaren. He noted she had migraine headaches which responded well to Imitrex. He expressly opined her carpal tunnel was not severe and the major problem was her right elbow.

On January 10, 1996, Plaintiff presented to Dr. Hersey with complaints of chest pain radiating into her back between the shoulder blades (R. 185). She also reported getting short of breath easily and needing to prop her head up at night to breathe sometimes. She denied palpitations. Dr. Hersey noted that Plaintiff's lungs were clear, but she did seem to have reduced air movement. The chest pain was not thought to be angina. Dr. Hersey diagnosed shortness of breath; chest pain of unknown etiology; and hypercholesterolemia and referred Plaintiff to a pulmonologist.

On April 2, 1996, Plaintiff underwent an Adult Mental Profile conducted by Frank B. Eibl, M.A., at the request of the State agency (R. 254-258). Plaintiff stated her reason for pursuing disability was "I possibly have arthritis of the heart cage and spine areas." She also indicated she had carpal tunnel syndrome in both wrists, tennis elbow, arthritis of the shoulders, kidney difficulties at times, and migraine headaches.

Upon Mental Status Examination, Mr. Eibl noted that Plaintiff's memory was impaired (R.

256). She experienced difficulty performing serial three's. Abstract reasoning was below average. Testing indicated her IQ was 87 Verbal, 96 Performance, and 90 Full Scale (R. 256). Achievement testing showed Plaintiff's spelling and arithmetic were at the 7th grade level and reading was at the high school level. Mr. Eibl noted that Plaintiff manifested a low average level of academic efficiency in all areas with functional levels falling within the 7th to 8th grade levels. No areas of severe academic impoverishment were indicated, however.

Plaintiff's daily activities were listed as rising early, experiencing a great deal of stiffness and discomfort during the early morning hours, not having any breakfast, taking a shower, at times having lunch, watching television, reading a great deal during the afternoon, trying to do very light house activities when able, at times taking a nap, sitting watching television a little, and retiring early. She occasionally did some cooking. She had difficulty doing laundry. She did limited household chores. She was unable to do any heavy house cleaning. She could not sweep or mop. She did not walk for exercise. She generally did not visit others, but occasionally had company. She occasionally tried to walk for exercise. She read quite frequently. She had no hobbies or outside interests. She used to enjoy crafts and woodwork, ceramics and quilting and sewing. At times she needed help dressing.

Plaintiff reported she did not participate in or belong to any groups or clubs. She attended church on a weekly basis. She occasionally ate in restaurants. She had friends and talked on the telephone.

Mr. Eibl opined Plaintiff demonstrated fair attention and concentration and worked somewhat slowly, showing fair persistence.

Mr. Eibl's diagnoses included mood disorder due to general medical condition, with

depressed features; and anxiety disorder due to general medical difficulties with generalized anxiety (R. 257).

On April 10, 1996, an x-ray of Plaintiff's right shoulder indicated degenerative changes at the AC joint along with a small spur arising from the inferior surface of the distal clavicle of the AC joint (R. 184). There were no calcifications; soft tissues were normal; the glenohumeral joint was intact; and the bony structures are otherwise normal.

On May 7, 1996, Plaintiff told Dr. Hersey her pain was no better (R. 182). She still had pain in her neck and shoulders. The carpal tunnel was also giving her a lot of problems. The chest pain was also still present and was reproduced by palpation of the area. Dr. Hersey reported Plaintiff had had a "very through" pulmonology work-up, which was normal. Thoracic x-rays were negative. Cardiac exercise studies and echocardiogram were negative. Pulmonary laboratory studies were normal. Thyroid studies were normal. A gastrointestinal consultative examination was normal. Dr. Hersey assessed costochondral pain, osteoarthritis, fibromyalgia, and hyperlipidemia, and referred Plaintiff to a rheumatologist.

On August 27, 1996, Plaintiff presented to Dr. Hersey with complaints of pain in her chest and back which was reproduced with the slightest palpation (R. 181). Plaintiff's neurological examination was unremarkable. Reflexes were normal. Dr. Hersey diagnosed fibromyalgia and anxiety.

On October 16, 1996, Plaintiff presented to Dr. Hersey with complaints of back pain (R. 180). She stated she had bent over to pick something up off the floor, and felt sharp pain in her lumbar spine. The pain was across her lower back with no radiculopathy. Palpable spasms were noted. Her reflexes were normal. Dr. Hersey diagnosed lumbar sprain and prescribed Darvocet. He noted, however, that Plaintiff was to go to a specialist for her cervical and dorsal spine pain, and

he did not want to do anything regarding her lumbar sprain that might "mask her genuine symptoms or condition."

On October 17, 1996, rheumatologist Kevin Hackshaw, M.D., evaluated Plaintiff upon referral from Dr. Hersey (R. 259). He noted that extensive pulmonary, cardiac and GI workups had been done, including echocardiogram which was negative, pulmonary studies which were normal, thyroid functions which were within normal limits and GI evaluation which was negative. EMG testing indicated mild bilateral carpal tunnel syndrome.

Upon examination, the most significant finding was that Plaintiff had more than the 11 out of 18 diffuse tender points considered to be consistent with a diagnosis of fibromyalgia (R. 260). Dr. Hackshaw prescribed Doxepin, and advised Plaintiff that she might require physical therapy as an adjunct in the near future.

On January 3, 1997, Plaintiff presented to Dr. Hersey with complaints of rash on her neck, torso and extremities after taking Entex she had left from May 1995 for ear pain (R. 180). She was diagnosed with rash and ear infection.

Dr. Hersey retired in 1998.

In April 1999, Carlos Jimenez, M.D., took over Plaintiff's treatment from Dr. Hersey (R. 265). On April 9, 1999, Plaintiff presented to Dr. Jimenez for a bee sting on her right arm (R. 265). Dr. Jimenez diagnosed bee sting and hypercholesterolemia. Plaintiff was subsequently hospitalized after reporting she felt like her throat was swelling a little and she felt anxious.

On April 12, 1999, Plaintiff presented to Dr. Jimenez for complaints of a bout of rapid heart beat with rash and itching after she left the office the prior Friday (see above paragraph) (R. 266). Dr. Jimenez diagnosed generalized anxiety disorder and hyperlipidemia.

7

On May 3, 1999, Plaintiff advised Dr. Jimenez that she had been feeling "flutter and racing of heart" for two weeks (R. 268). When it stopped her shoulder blade ached with pain into the thumb of her left hand, with sore mid-chest area and heavy legs (R. 268). Dr. Jimenez diagnosed cardiac arrhythmia.

On July 26, 1999, Plaintiff presented to Dr. Jimenez with complaints of shortness of breath, tiredness, and shooting pain on the left side of her neck (R. 271). Dr. Jimenez diagnosed hyperlipidemia.

On September 10, 1999, Plaintiff complained to Dr. Jimenez of headache (R. 272). He diagnosed migraine headache and prescribed Tenormin.

On October 21, 1999, Plaintiff reported the Tenormin was helping her some. She stated her heart "still want[ed] to beat fast." Dr. Jimenez diagnosed migraine headache, cardiac arrhythmia, and hyperlipidemia.

On November 8, 1999, Plaintiff presented to Dr. Jimenez with soreness in her left breast with swelling and warmth and shortness of breath over the weekend (R. 274). She said she took a "nerve pill" and felt better.

Plaintiff's Date Last Insured is December 31, 1999.

On August 6, 2001, Plaintiff began treatment at Wheeling Health Right, Inc. (R. 144). She was initially diagnosed with hyperlipidemia, fibromyalgia, migraine, and status post hysterectomy on hormone replacement therapy (R. 147). She was prescribed Zocor, Celebrex, Premarin, Axid, and Imitrex.

On January 28, 2002, Plaintiff was examined for a mass in her right breast (R. 129-131). At that time Plaintiff reported loss of sleep and some sweats since being taken off hormone therapy.

She also reported an occasional episode of palpitations and a history of migraine headaches. She denied any respiratory, eye, ear, or gastrointestinal symptoms. Her "past medical history" was significant for hypercholesterolemia and fibromyalgia. She had a hysterectomy in 1986 and a thyroidectomy in 1983, and eye surgery and nose surgery "in the past." Her only current medications were Zocor, Vitamin E, and "'Pain Away' for headache pain."

Musculoskeletal examination was without gross deficit or deformity, and HEENT examination was normal. There was a mass in her right breast with tenderness, and significant tenderness of the left breast. Follow-up of this mass was advised.

Plaintiff was eventually diagnosed with breast cancer, and underwent a left mastectomy and right radical mastectomy in September 2002 (R. 169). She underwent subsequent chemotherapy.

On June 14, 2002, more than two years after her insured status expired, Plaintiff presented to Wheeling Health Right with left hip pain (R. 132). She stated the pain came from an old motor vehicle accident that occurred two years earlier. She had been treated at the time, had 12 weeks of physical therapy, and the back pain resolved. The back pain had since returned, however. It hurt down across her left lower quadrant down into her left leg, into her left knee.

On March 3, 2003, more than three years after her insured status expired, Plaintiff was referred by the State agency for a consultative examination, which was conducted by B.J. Kerbyson, D.O. (R. 169). Plaintiff stated she was claiming disability due to fibromyalgia, "real bad migraines" and a "bad back."

Upon examination, Plaintiff ambulated with a normal gait, without assistive device (R. 171). Although she arrived in a wheelchair, she left it in the hallway and had no difficulty walking into the room. Shoulders, elbows, and wrists were non-tender, with no redness, warmth, swelling or nodules.

Examination of the legs revealed no tenderness. There was no redness, warmth, swelling, fluid, laxity or crepitus of the ankles or feet. There was mild to moderate tenderness and crepitation in the knees, but no redness, warmth or swelling. There was no calf tenderness, redness, warmth or swelling. Examination of the cervical spine revealed no tenderness or muscle spasm.

The dorsolumbar spine had normal curvature. There was no evidence of muscle spasm and no tenderness to percussion. Straight leg raises were normal both sitting and supine. Plaintiff could stand on one leg at a time with some difficulty. There was no hip joint tenderness, redness, warmth, swelling or crepitus. She did have left hip pain with range of motion testing. Muscle strength and tone were normal in upper and lower extremities. Sensory was preserved. Plaintiff could heel-toe walk and squat with some difficulty.

Dr. Kerbyson diagnosed breast cancer status post mastectomy with current chemotherapy; fibromyalgia; lumbar disc disease; migraines and cephalgia; and hyperlipidemia (R. 172). He summarized his evaluation as follows:

> The claimant is a 56-year-old female currently receiving chemotherapy. On examination today she appeared to be fatigued throughout the exam. Strength testing revealed some generalized weakness. The claimant also has a history of anemia secondary to chemotherapy.
>
> Straight leg raise test was negative for radiculopathy. There are range of motion abnormalities of the lumbar spine as noted above. Deep tendon reflexes are brisk and the sensory and motor modalities are well preserved. There appears to be no evidence of weakness or nerve root compression. There is no evidence of upper motor neuron lesion. Grip strength and fine manipulation are well preserved bilaterally.

Dr. Kerbyson also submitted a Medical Source Statement of Ability to do Work-Related Activities (Physical), opining that Plaintiff could lift only ten pounds occasionally and less than ten pounds frequently; could stand and/or walk less than two hours in an eight-hour workday, and had no

10

impairment in sitting (R. 176-177). She could never climb or balance, but could occasionally kneel, crouch, crawl, and stoop. She was limited to occasional manipulations. Dr. Kerbyson expressly attributed all these limitations to Plaintiff's current chemotherapy.

## NEW EVIDENCE SUBMITTED TO THE COURT

Dr. Hersey, Plaintiff's treating physician until 1998, submitted a letter/report dated June 6, 2003 (more than five years after he last saw Plaintiff).

The undersigned notes that this evidence was not referenced by the Appeals Council in its decision of January 2004, nor was it made a part of the administrative record. Plaintiff has attached the letter as an Exhibit to her Memorandum, and requests the Court remand this matter for consideration by the Commissioner of this evidence. For reviewing purposes, the undersigned has reproduced the letter in pertinent part:

> Betty Jo Kidd was first seen in my office on Feb. 11, 1992. Her chief complaint at that time was migraine headaches which she stated she had suffered for the previous six years. Her last visit at my office was on Oct. 1, 1998, although there was a telephone contact in February of 1999.
>
> During this above time frame, Betty was seen for multiple problems, but primarily her complaints involved neck, back as well as upper and lower extremity pains. Her diagnoses were bilateral carpal tunnel syndrome (mild) established by EMG, fibromyalgia syndrome (consultation with rheumatology at Ohio State University), GERD (consultation with gastroenterology). Frequent episodes of back and neck pain.
>
> Betty had episodes of chest pain, and she was referred to a cardiologist who obtained an exercise stress test and cardiac catheterization, revealing normal coronary arteries and no evidence of cardiac disease. She was subsequently referred to pulmonology, and pulmonary function tests were normal. She was placed on no medications for pulmonary problems.
>
> She experienced gastrointestinal discomfort and a sore throat secondary to reflux. She was referred to gastroenterology, esophogram and upper GI were negative. She was placed on medication (Prevacid) to treat hyperacidity with improvement.

11

Signs of depression were present in the patient at times, but she was never deemed to be of a clinical extent to require continuous antidepressant medications. Much of her moods were more of a discouragement relative to her health condition and her inability to work. She frequently presented with complaints of pain in her neck, back, upper extremities.

. . . .

Her surgical history was significant for hysterectomy, thyroid surgery, nasal septal defect surgery, and some fatty nodules removed from her eyelids. Her medications included Prevacid for GERD, Ativan for anxiety, Imitrex for migraine headaches, and Premarin/Provera hormone replacement therapy. At one point she was placed on Elavil, an antidepressant, but also considered effective in treating fibromyalgia pain. She could not tolerate this medication.

Ms. Kidd was also treated with NSAIDs, and was referred for physical therapy. Her therapy treatments consisted of moist heat and ultrasound for its thermal effect. An exercise program was then initiated in pain free ranges of upper body movement. Postural exercises and upper thoracic strengthening along with anterior chest stretch was used. She was trained to continue with a home exercise program. She did report some improvement, but continued to have chronic soreness and pain to some extent. She was noted by therapist to have normal strength and motion of upper extremity joints. With palpation she was noted to have muscle tightness and tenderness. Ms. Kidd did not complete the schedule of therapy sessions.

My clinical experience with Betty was that she suffered a fibromyalgia syndrome of chronic nature that did not respond well to our therapeutic modalities. After a thorough workup involving cardiology, pulmonology, rheumatology, gastroenterology, without definitive clinical findings, we tried to continue finding medications and therapy measures which would give her some relief. Her presentation was consistent in the location and nature of the pain she experienced.

I considered her at that time to be essentially unable to pursue anything but activities that would be sedentary in nature. Even then, extended periods of repetitive motion of her upper extremities would probably produce strain and resulting pain to her upper extremities as well as her back and neck . . . .

### III. Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations, ALJ Levine made the following findings:

1. The claimant meets the nondisability requirements for a period of disability and

Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and was insured for benefits through December 31, 1999.

2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3. The claimant has severe impairments, based upon the requirements in the Regulations (20 CFR § 404.1521).

4. These medically determinable impairments did not meet or medically equal one of the listed impairments in appendix 1, Subpart P, Regulation No. 4 through her date last insured.

5. The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6. The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairment (20 CFR § 404.1527).

7. The undersigned finds that, as of her date last insured, the claimant retained the residual functional capacity to lift and carry 10 pounds frequently and 20 pounds occasionally, sit for about 6 hours in an 8-hour workday, stand and walk for about 6 hours in an 8-hour workday, alternate between sitting and standing at will, and push and pull as much as she can lift and carry. In addition, the claimant requires entry level work tasks, can occasionally stoop, kneel, crouch and crawl, and should avoid continuous fine finger movements, temperature extremes, continuous rotation of the wrists or climbing. Thus, the claimant has the residual functional capacity for a limited range of light work.

8. The claimant was unable to perform any of her past relevant work (20 CFR § 404.1565).

9. As of December 31, 1999, her date last insured, the claimant was an individual "closely approaching advanced age" (20 CFR § 404.1563).

10. The claimant has a "high school education" (20 CFR § 404.1564).

11. The claimant has no transferable skills from any past relevant work (20 CFR § 404.1568)..

12. The claimant has the residual functional capacity to perform a significant range of light work (20 CFR § 416.967).

13. Although the claimant's exertional limitations do not allow her to perform the full

range of light work, using Medical-Vocational Rule 202.14 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform. Examples of such jobs include work as an usher (32,655 jobs in the national economy and 31 locally), a general office clerk (148,050 jobs in the national economy and 10 locally) and a private mail clerk (51,300 jobs in the national economy and 10 locally).

14. The claimant was not under a "disability," as defined in the Social Security Act, at any time through her date last insured (20 CFR 404.1520(f).

(R.22-23).

## IV. Contentions

Plaintiff contends that the evidence attached to her Memorandum is new and material evidence, and requests the Court remand this matter to the Commissioner for consideration of Dr. Hersey's June 6, 2003 letter/report.

Defendant contends Plaintiff's new evidence does not support a remand of this matter.

## V. Discussion

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984)

*(quoting Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

### B. Remand for New Evidence Submitted to the Court.

Plaintiff moves the Court for a Remand of this matter to the Commissioner based on new and material evidence – that is, Dr. Hersey's June 2003 letter/report. Defendant contends that this new evidence does not support a remand of this matter.

In *Borders v. Heckler*, 777 F.2d 954 (4th Cir. 1985), the Fourth Circuit held that newly discovered evidence submitted to the Court may warrant a remand to the Commissioner if four prerequisites are met: 1) the evidence is relevant to the determination of disability at the time the application was first filed and not simply cumulative; 2) the evidence is material to the extent that the Commissioner's decision might reasonably have been different had the new evidence been before her; 3) there is good cause for the claimant's failure to submit the evidence when the claim was before the Commissioner; and 4) the claimant has presented to the remanding court at least a general showing of the nature of the newly discovered evidence. *Id.* at 955.

The undersigned finds the evidence meets factor 3), in that the reason the letter was not produced at the administrative level was that Dr. Hersey had retired four years earlier, and Plaintiff had not been able to get the information from him until 2003. The evidence also meets factor 4), as Plaintiff attached the actual evidence to her memorandum. The evidence only barely meets condition number 1), however. A review of Dr. Hersey's 2003 letter and the record indicates that the letter for the most part merely restates in summary form all the evidence from Dr. Hersey that was already

before the ALJ. This evidence was already considered at the Administrative level, and is therefore cumulative. The only evidence that is arguably "new" is contained in the last paragraph of the letter, as follows:

> I considered her at that time to be essentially unable to pursue anything but activities that would be sedentary in nature. Even then, extended periods of repetitive motion of her upper extremities would probably produce strain and resulting pain to her upper extremities as well as her back and neck . . . .

The undersigned finds this one paragraph arguably "new" and relevant, in that the ALJ expressly noted in his Decision that "the record fails to demonstrate that a treating physician assessed the claimant with functional restrictions prior to her date last insured" (R. 20).

The only issue is therefore whether the evidence is material – that is, whether the ALJ's decision might reasonably have been different had this evidence been before him. The undersigned finds it would not. First, the issue of RFC is one reserved to the Commissioner. *See* 20 CFR § 404.1527(e)(2) which provides, in pertinent part:

> We use medical sources, including your treating source, to provide evidence, including opinions, on the nature and severity of your impairment(s). Although we consider opinions from medical sources on issues such as whether your impairment(s) meets or equals the requirements of any impairment(s) in the Listing of Impairments in appendix 1 to this subpart, *your residual functional capacity* (see §§404.1545 and 404.1546), or the application of vocational factors, the final responsibility for deciding these issues is reserved to the Commissioner.

(Emphasis added).

In addition, neither Dr. Hersey's office notes nor his 2003 letter support his opinion limiting Plaintiff to limited sedentary work. While Plaintiff did have carpal tunnel syndrome it was considered only mild on the right and minimal on the left (R. 201). While Dr. Hersey noted Plaintiff's right tennis elbow was "very painful," testing only showed she had "some tenderness" in that area, with no weakness or atrophy. X-rays of Plaintiff's shoulder indicated only degenerative changes at the AC

16

joint along with a small spur (R. 184). There were no calcifications, soft tissues were normal, the glenohumeral joint was intact, and the bony structures were otherwise normal. Objective tests did not support the level of pain and limitation Dr. Hersey opined Plaintiff had five years earlier. Even Dr. Hersey himself stated that "a thorough workup" failed to indicate definitive clinical findings. Further, he noted that Plaintiff reported some improvement with physical therapy, continuing only to have "chronic soreness and pain *to some extent.*" (Emphasis added). Yet she failed to continue in physical therapy. Dr. Hersey also noted that Plaintiff's therapist found she had normal strength and motion of upper extremity joints.

For all the above reasons, the undersigned finds Dr. Hersey's letter would not reasonably have changed the ALJ's or the Appeals Council's decision. The evidence submitted to the Court therefore does not warrant remand to the Commissioner.

Although not expressly argued by the parties, the undersigned also finds that the Appeals Council did not err in not considering the new evidence. In *Wilkins v. Secretary*, 953 F.2d 93 (4th Cir. 1991), the Fourth Circuit determined that the Appeals Council will consider evidence submitted to it if the evidence is (a) new, (b) material, and (c) relates to the period on or before the date of the ALJ's decision. *Wilkins* further defined the terms "new" and "material" as follows:

> Evidence is new . . . if it is not duplicative or cumulative . . . .
> Evidence is material if there is a reasonable possibility that the new evidence would have changed the outcome.

*Id.* at 96. Again, the undersigned finds Dr. Hersey's letter was not "material" – that is, there is not a reasonable possibility that it would have changed the ALJ's decision.

Plaintiff does not actually argue, but does allude to the 2003 consultative examination, stating that Dr. Kerbyson noted Plaintiff appeared fatigued throughout the examination and strength testing

17

showed generalized weakness (Plaintiff's Brief at 7). In addition, Dr. Kerbyson limited Plaintiff to a reduced range of sedentary work. This would seem to support Dr. Hersey's opinion. This examination, however, also took place more than three years after Plaintiff's insured status expired. Plaintiff argues:

> [T]here has been no demonstration of a significant worsening or progression of any of her severe impairments that existed on or before her DLI. Further, the Plaintiff had a successful breast cancer surgery so it cannot be legitimately claimed that such would have explained the basis for lesser functional capabilities as compared to the ALJ's residual functional capacity ("RFC") finding in his ruling.

*Id.* The undersigned does not agree with this contention. While Dr. Kerbyson did note Plaintiff appeared fatigued with some generalized weakness, he also expressly noted she was undergoing chemotherapy at the time and had a history of anemia secondary to the chemotherapy (R. 173). Dr. Kerbyson expressly based his entire RFC of "sedentary" and all the additional limitations on Plaintiff's "currently receiving chemotherapy and consequently has anemia, weakness and fatigue" (R. 176-178). As already noted, Plaintiff was diagnosed with breast cancer and underwent chemotherapy two years after her date last insured. Therefore, contrary to Plaintiff's argument, it *can* be "legitimately claimed that [her breast cancer] would have explained the basis for lesser functional capabilities as compared to the ALJ's residual functional capacity ("RFC") finding in his ruling."

Even though this issue was not expressly argued by the parties, the undersigned finds substantial evidence does support the ALJ's determination that Plaintiff was not disabled at any time through her date last insured.

## VI. RECOMMENDATION

For the reasons herein stated, I find substantial evidence supports the Commissioner's decision denying Plaintiff's application for DIB. In addition, I find the new evidence submitted to the Court

does not warrant remand to the Commissioner. I accordingly recommend Defendant's Motion for Summary Judgment be **GRANTED**, and Plaintiff's Motion for Remand be **DENIED**, and this matter be dismissed from the Court's docket.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Frederick P. Stamp, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), *cert. denied*, 467 U.S. 1208 (1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *Thomas v. Arn*, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail an authenticated copy of this Report and Recommendation to counsel of record.

Respectfully submitted this 18 day of May, 2005.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE